[Cite as *Woodford v. Woodford*, 2022-Ohio-3656.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Chad N. Woodford, :

    Plaintiff-Appellant, :

                                   No. 20AP-377

v. : (C.P.C. No. 18DR-1824)

Danielle L. Woodford, : (REGULAR CALENDAR)

    Defendant-Appellee. :

---

D E C I S I O N

Rendered on October 13, 2022

---

**On brief:** *Wolinetz & Horvath, LLC*, *Dennis E. Horvath*, and *Eric M. Brown*, for appellant. **Argued:** *Eric M. Brown*.

**On brief:** *Grossman Law Offices*, and *Tracy A. Younkin*, for appellee. **Argued:** *Tracy A. Younkin*.

---

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Plaintiff-appellant, Chad N. Woodford, appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch in this contested divorce matter.

{¶ 2} Chad and Danielle L. Woodford were married on March 7, 2015, in Fairfield County, Ohio. Danielle had custody of her three minor children from her prior marriage, M.L.C. (dob 11/24/08), A.A.C. (dob 7/14/06), and D.T.C. (dob 2/28/05). Shortly after Chad and Danielle were married, Danielle was forced to deal with a heart condition which required surgery. Although the biological father of Danielle's children was directly involved

with their lives and he spent time with them frequently, it was felt that he could not be relied on for their long-term care and parenting, as he was not under court order to pay support and was not financially able to provide for the children. After discussing it with a probate attorney, Chad and Danielle decided that Chad would petition for step-parent adoption of Danielle's three children, and the children's biological father consented to this arrangement. They retained an adoption attorney, and on October 12, 2016, those adoptions were finalized.

{¶ 3} Chad and Danielle also decided early on to have another child, but initially had a difficult time getting pregnant. Danielle eventually became pregnant by in vitro fertilization and gave birth to G.W. in 2017.

{¶ 4} In January 2018, less than one year after G.W.'s birth, Chad informed Danielle that he wanted a divorce. Initially, they agreed to stay together through spring 2018 so the three older children could finish the school year. But when Danielle suffered a mental health crisis around that time and transported herself to a mental health facility at OSU Harding Hospital for an inpatient stay, the parties separated.[1] They each retained counsel and negotiated a proposed separation agreement and proposed shared parenting plan, and the case was scheduled for an uncontested divorce hearing in mid-2018.

{¶ 5} Prior to that hearing, Danielle obtained new counsel and withdrew her consent from the agreement. Instead, she filed a motion for a temporary order and to return the case to the contested docket. This may have been prompted in part by the fact that the proposed shared parenting plan envisioned Chad co-parenting the three older

---

[1] After a stay of 12 days and her subsequent release, Danielle re-admitted herself in March 2018 and was inpatient for approximately one month. She made additional suicidal threats while hospitalized and was in fact hospitalized for a third time in January 2019, and medical records stemming from that period reveal that Danielle had been stockpiling medication. Danielle had also been violent towards Chad on at least two occasions.

children, but he had admitted that he did not intend to maintain a relationship with them and was only interested in parenting for the infant G.W.

{¶ 6} Thereafter, the parties agreed that Danielle would have sole custody of the three older children, and parental rights regarding G.W. became the primary issue for trial. A Guardian ad Litem ("GAL"), was appointed for the children, and psychological experts were hired by both parties—Dr. Robin Tener was hired by Danielle, and Dr. James Reardon was hired by Chad. Each of the psychological experts prepared a detailed report announcing their respective recommendations and conclusions.

{¶ 7} Dr. Tener did not assign a mental health diagnosis to Chad, but noted that he had a "rather self-absorbed personality style" and a "strong tendency to deflect blame and avoid accountability for his behavioral choices." (Report of Dr. Robin Tener, Joint Ex. F6 at 27.) Dr. Tener expressed concerns that Chad would have trouble with "the realities of ongoing co-parenting contact with [G.W.]'s mother," and that Chad's actions—posting provocative and pointed attacks on Danielle on social media, permitting his girlfriend to participate in his own social media disputes with Danielle, and allowing his girlfriend to be present during companionship exchanges—demonstrated that Chad was likely to have "difficulty navigating this without contributing to 'drama' that may ultimately affect [G.W.]" *Id.* Dr. Tener was also concerned that Chad "seems to 'attach' and 'detach' from relationships rather readily," which was exemplified by his "eager[ness] to distance himself from the children because of their connection" to Danielle. *Id.* at 28. Despite these concerns, Dr. Tener concluded that "[w]ith appropriate interevention[s], his co-parenting interactions and the decisions that underlie [Chad's] responses might reflect a higher level of maturity, and might result in behavioral choices that place [G.W.'s] needs at the forefront." *Id.* at 29.

{¶ 8} In his evaluation report regarding Danielle, Dr. Reardon noted that Danielle had previously been diagnosed with a personality disorder and major depressive disorder, but that his own evaluation indicated that while Danielle "does evidence some significant psychological disorders or conditions, specifically the Persistent Depressive Disorder with major depressive episodes and anxious distress," he was unable to identify sufficient evidence in the forensic setting to support a diagnosis of "Unspecified Personality Disorder with borderline and dependent traits." Report of Dr. James Reardon, Joint Ex. E5 at 29, 35.) He concluded that "Danielle has made a committed effort to address the issues that were problematic both for her and for the interaction between she and Chad," and so long as Danielle "continues to be compliant with current treatment regimen[,] I believe there is a high probability that she will continue to remain adequately stable and that she will be able to parent [G.W.] as well as her other children and that she may be able to cooperate reasonably with [G.W.]'s father Chad in [G.W.]'s best interest." *Id.* at 30. He subsequently qualified this projection without rejecting it:

> It appears that in the past six months she has been adequately stable to resume parenting behavior with her three older children and with [G.W.] * * * [S]he has the capability to cooperate with Chad Woodford—the question is whether she chooses to do so. Based on past history, that statement on my part may be overly optimistic. If she were unable to cooperate with [G.W.]'s father Chad Woodford, in my opinion it would likely be in part because of her choice and in part because the personality traits that I have described in the report (specifically borderline and dependent traits) would complicate her ability to do so.

*Id.* at 33.

{¶ 9} After an investigation, on April 15, 2019 the GAL issued a pre-trial recommendation of shared parenting for G.W. The GAL observed that Chad has declined to take Danielle's three older children on Tuesday visits as recommended, and that "both

parents have done these children a disservice in telling them things [about the parents and their relationship] they have no need to know." (Pre-trial Report of GAL, Joint Ex. B1 at 4.) The GAL's report indicated that her "main concern about [Danielle] is that she can be extremely controlling/manipulative," and as to Chad her "main concern" is that he "has behaved very immaturely and selfishly at times." *Id.* at 28, 29. The GAL observed that "the parents should exercise shared parenting with [G.W.] despite the fact that they do not meet any of the statutory criteria for successful shared parenting. The fact of the matter is, they have been 'sharing' the parenting and G.W. is doing well." *Id.* at 30. The report stated that the GAL "would not trust either parent to hold the reigns of full custody and not expect [G.W.] to suffer as a result due to all of the anger and animosity [between the parents]." *Id.* at 30-31. The GAL subsequently issued a two-page "updated recommendation," again recommending shared parenting, but making specific recommendations regarding therapies for mother and for both parents together, suggesting that a parenting coordinator should be appointed to assist the parents and that both parents should be ordered to work with a counselor "after the divorce is finalized until [the counselor] releases them from joint therapy with the goal toward productive co-parenting." (Woodford Updated Recommendations at 1, attached to Feb. 14, 2020 Interim Order as Ex. A.)

{¶ 10} The case proceeded to trial on October 7, 8, 9, and 21, 2019. As Chad had openly admitted that he did not intend to have a relationship with the three older children, the parties agreed that Danielle would have sole custody of them. Moreover, the parties agreed to stipulate to the proposed separation agreement signed by the parties and filed in May 2018; while there were some disputes related to this document during the pendency of the case, those disputes were largely resolved by the time the case went to trial. Accordingly, the allocation of parental rights for G.W. was the main issue at trial, and Chad,

Danielle, Dr. Tener, Dr. Reardon, and the GAL all testified extensively on that question. The GAL specifically testified that Danielle had worked on cooperating with Chad, that she was following the recommendations of her doctors and therapist, and had made notable progress:

> Q: As this case has transpired and you've been involved, would you say that Danielle has done a better job removing the emotion and attempting to work with Chad as a co-parent?
>
> A: Are you talking from August of 2019 to now?
>
> Q: Yes.
>
> A: Yes. I think that she is trying to do a better job.
>
> Q: And that was my next question, do you think she's working on becoming a better co-parent?
>
> A: I would hope so. I haven't seen the negative yelling, screaming, calling the police stuff that was going on back then.
>
> Q: Let's talk about a recent controversy between the two of them. That's the private daycare?
>
> A: Yes.
>
> Q: Do you believe Danielle approached that logically and reasonably?
>
> A: Yes. And I think that the email exchange, the chain that went back and forth between them, I think they both did a good job of trying to work it out.

(Tr. at 823-24.) In accordance with her own observations as well as Dr. Reardon's, the GAL recommended sole custody of the three older children to Danielle and shared parenting for G.W.

{¶ 11} On July 6, 2020, the trial court filed a decree of divorce adopting the separation agreement regarding division of the marital assets, awarding custody of the three older children to Danielle, adopting a shared parenting plan for G.W., designating

Chad as the residential parent for school placement, and ordering Chad to pay child support in the amount of $891.95 per month—apparently a downward deviation from the total calculated amount of $955.35.  The trial court did not adopt or include a child support worksheet in its entry, but it appears that the parties completed one.  Chad has now appealed to this court, and asserts four assignments of error with the trial court's judgment.

> **Assignment of Error No. 1:** The trial court erred and abused its discretion when it awarded shared parenting to the parties with respect to the parental rights and responsibilities of G.W.
>
> **Assignment of Error No. 2:** The trial court erred and abused its discretion when it ordered appellant to pay child support in the amount of $891.95 per month.
>
> **Assignment of Error No. 3:** The trial court erred and abused its discretion when it failed to award appellant any sum of legal fees.
>
> **Assignment of Error No. 4:** The trial court erred and abused its discretion when ruling upon certain evidentiary matters.

As Chad's four assignments of error indicate, this court generally reviews the issues on appeal of a divorce case for abuse of discretion.  *See generally Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).  *See also Dannaher v. Newbold*, 10th Dist. No. 03AP-155, 2004-Ohio-1003 (parental rights reviewed for abuse of discretion); *Roush v. Roush*, 10th Dist. No. 19AP-246, 2019-Ohio-4777 (child support award reviewed for abuse of discretion); *McCall v. Kranz*, 10th Dist. No. 15AP-436, 2016-Ohio-214 (award of legal fees reviewed for abuse of discretion); and *Columbus v. Phillips*, 10th Dist. No. 15AP-408, 2015-Ohio-5088 (evidentiary issues reviewed for abuse of discretion).  In accordance with the governing law and the aforementioned cases, Chad contends that the trial court's decisions under each assignment of error were unreasonable, arbitrary, and/or unconscionable.

{¶ 12} As to his first assignment of error, Chad argues that although the trial court "technically" considered the required best interest factors of R.C. 3109.04(F)(1) and shared parenting factors of R.C. 3109.04(F)(2) in deciding to order shared parenting of G.W., he contends that the record clearly establishes both that shared parenting is not in G.W.'s best interest, and maintains that the trial court's weighing of the R.C. 3109.04(F)(1) and (2) factors to reach contrary conclusions was an abuse of discretion.

{¶ 13} But the court adopted proposed findings of fact with respect to R.C. 3109.04(F)(1) and (2) that were supported by record evidence (notably including Chad's own testimony, the testimony of Dr. Tener, and the recommendation of the GAL), and Chad has not specifically identified which of those findings he alleges to constitute an abuse of the trial court's discretion. Instead, his primary contention is that the evidence shows that the parties are incapable of effective communication and are unable to make joint decisions and that appellate courts have affirmed the denial of shared parenting in such circumstances. *See, e.g., Gibson v. Gibson*, 12th Dist. No. CA2016-01-002, 2016-Ohio-4996, ¶ 16, and *Brandt v. Brandt*, 11th Dist. No. 2012-G-3064, 2012-Ohio-5932, ¶ 19-22. Based on these cases, Chad suggests that "ineffective communication and inability to make joint decisions is effectively fatal to a prospect for shared parenting," (Appellant's Brief at 21.), and that the trial court's award is by definition an abuse of its discretion.

{¶ 14} The fact that a denial of shared parenting does not constitute an abuse of the trial court's discretion does not in itself demonstrate that a grant of shared parenting in similar circumstances is an abuse of discretion. Here, the trial court specifically considered the evidence and observed that while "[t]he parents do not *currently* communicate [] well with each other * * * *they each love [G.W.] and have followed the Court's orders*." (Emphasis added.) (July 6, 2020 Findings of Fact at 7.) The court accordingly concluded

that the parties would be capable of joint action in G.W.'s best interest once parental rights and responsibilities were allocated by court order. And the court took important steps to safeguard and address any issues, ordering that "each parent is required to cooperate with the other parent and co-parent," and—in accordance with the GAL's suggestion—ordering that "a parenting coordinator will be appointed to resolve disputes." (Findings of Fact at 10.)

{¶ 15} Chad also argues that the evidence of Danielle's mental health issues mandated a grant of sole custody of G.W. to him. But again, the trial court was aware of and accounted for this evidence, and the court's findings of fact specifically observe that "Chad has his own emotional issues that affect his ability to be a full-time parent and have full and complete custody of [G.W.]." (Findings of Fact at 5.) The court relied upon Dr. Tener's observations that Chad was "self-absorbed," that he "deflect[ed] blame and avoid[ed] accountability for his behavioral choices," that his "social media postings suggest he apparently had difficulty exercising maturity that he insisted he possessed," and that if his "current relationship ends up as less ideal [than] he depicts, [G.W.] will be affected by whatever changes occur." While the great weight of the psychological concerns addressed at trial stemmed from Danielle's longstanding issues, both experts agreed that Danielle was making great strides and seriously attempting to address those issues. Dr. Reardon concluded that she " 'has made a committed effort to address the issues that were problematic both for her and for the interaction between she and Chad," and that "there is a high probability that she will continue to remain adequately stable and that she will be able to parent [G.W.] as well as her other children * * *.' " (Findings of Fact at 3, quoting Dr. Reardon's Report at 30.)

{¶ 16} Based on this record, the trial court was entitled to find that the parties were capable of joint decision-making if ordered to do so, and was entitled to rely on Danielle's recent behavioral progress. The court's conclusion that in determining that sole custody was not required is not arbitrary, unreasonable, or unlawful, and its award of shared parenting is similarly not an abuse of the trial court's wide discretion over such matters. We therefore overrule Chad's first assignment of error.

{¶ 17} Passing over Chad's second assignment of error for now, we will next address his third assignment of error, in which he contends that the trial court abused its discretion under R.C 3105.73(A) by not awarding him attorney fees. Chad argues that the record established that on several occasions Danielle had threatened to drag out the divorce proceedings, and that she had in fact withdrawn her consent to the initially agreed uncontested divorce and award of shared parenting on the eve of the final hearing only to ultimately obtain less parenting time with G.W. than the original agreement proposed following the contested divorce trial.

{¶ 18} But Chad has simply established that the trial court could have awarded him attorney fees, not that it was required to. He cites *Klayman v. Luck*, 8th Dist. No. 97074, 2012-Ohio-3354, observing that the appellate court in that case affirmed an award of attorney fees in the amount of $325,000 where the appellant had "purposely prolonged litigation" and threatened the appellee that he would litigate for "years" and cause the expenditure of "hundreds of thousands of dollars" in legal fees. *Id*. at ¶ 41. But again, Chad has simply demonstrated that an award of fees in this case might not have been an abuse of discretion; he has not provided not a single reason why the decision to refrain from awarding attorney fees was an abuse of discretion.

{¶ 19} In fact, the trial court concluded that Chad's "actions did more to prolong this proceeding than they did to bring it to a conclusion," and that Chad's pressure on Danielle to quickly resolve the case by entering into a shared parenting plan "that clearly was not appropriate for Chad and Danielle moving forward" made "litigation of this case necessary and inevitable." (Findings of Fact at 10.) The court's conclusions are directly tied to the testimony of Dr. Tener, Danielle, and Chad himself, as well as to the documents originally filed in the case. We cannot say that given that evidence, the trial court's decision to deny Chad's motion for attorney fees was an abuse of discretion. Chad's third assignment of error therefore lacks merit and is overruled.

{¶ 20} In his fourth assigned error, Chad argues that the trial court abused its discretion in certain evidentiary rulings. He first challenges the trial court's decision regarding a document he had completed pertaining to the stepparent adoption and testimony regarding that document, which he alleged to have been protected by attorney-client privilege. But our review of the transcript reveals that the substance of the document was not discussed at trial other than to bolster the claim that Chad's relationship with Danielle's three children was "at times" a loving relationship. Moreover, Danielle was later asked about the document—which was in her possession—and averred that it was one of the documents that she and Chad prepared at the request of the agency that performed the adoption assessment, not by the adoption attorney. (*Compare* Tr. at 226-27 *with* Tr. at 512.) And finally, Chad's attorney affirmatively waived objection to "any exhibit that was discussed at trial" at the close of all evidence. Tr. at 829. Accordingly, to allow the document and questions was not an abuse of discretion, and given that the answers to the questions merely bolstered admissible evidence regarding Chad's relationship with the

three older children, we cannot find an abuse of discretion in the trial court's decisions regarding either the document or questions regarding it.

{¶ 21} Chad also challenges the court's ruling allowing a question he alleges sought confirmation of a hearsay statement made by one of the older children that she "appreciated" Chad's presence at her baptism. But even if we are to accept that the question itself sought to introduce hearsay, in his answer Chad simply stated that he "believe[d] she was happy about that, yes." *Id.* at 255. His answer is therefore not a statement made out of court that was offered to prove the truth of the matter asserted, *compare* Evid.R. 801(C), and is therefore not barred by Evid.R. 802. A related problem affects Chad's challenge to statements made in text messages by his sister that were read into the record—those text messages were clearly not offered to prove the truth of the matters they asserted, but were specifically offered to demonstrate that Chad and his sister were "mocking" Danielle. (Tr. at 558-59.)

{¶ 22} Chad also contends (for the first time in his reply brief) that the trial court relied on alleged hearsay evidence regarding an incident that occurred after the close of trial evidence—specifically, that G.W.'s pediatrician had recommended that G.W. receive a flu shot and Chad had refused to facilitate that vaccination. But there is nothing in the divorce decree filed by the court relating to that issue, and while the court post-trial/pre-decree decision does refer to the "most recent example of [Chad's] selfish and destructive dismissal of anyone else's opinion," the record demonstrates that the court had already been forced to address a motion regarding Chad's resistance to this recommendation prior to issuing its post-trial/pre-decree decision. *Compare* Jan. 17, 2020 Final Decision & Opinion at 2 *with* Jan. 10, 2020 Mot. at 2-3 and Jan. 10, 2020 Order at 1 (ordering Chad "to cooperate with Defendant Danielle Woodford's efforts for her minor child, [G.W.] to receive a flu shot").

Under these circumstances, the trial court's passing mention of this incident is not arbitrary, unreasonable, or unconscionable, and given that Chad raises this issue for the first time in his reply brief, we decline to address it further. *See, e.g., Hadden Co. L.P.A. v. Zweier*, 10th Dist. No. 15AP-210, 2016-Ohio-2733, ¶ 15 (citing App.R. 16(C) and holding that "[t]he purpose of a reply brief is to afford the appellant an opportunity to respond to the appellee's brief * * * we generally will not address an argument raised for the first time in a reply brief."). Therefore, Chad's fourth assignment of error is overruled.

{¶ 23} Finally, we turn to Chad's second assignment of error. He cites former R.C. 3113.215 and *Marker v. Grimm*, 65 Ohio St.3d 139 (1992), and argues that the trial court clearly and reversibly erred by failing to include its child support worksheet in the record. He contends that the absence of the worksheet makes it impossible "to determine the propriety of any internal calculations of the worksheet referenced by the trial court." (Appellant's Brief at 29.) Here, the court actually adopted a downward deviation from the expected award—the court ordered a 25% reduction in the guideline support. (*See* Jan. 17, 2020 Final Decision & Opinion at 4; Findings of Fact at 9.) ("The court believes it is appropriate for the child support paid by Chad to Danielle be deviated downward 25% based on [Chad] having greater than 50% of the parenting time with [G.W.]."). Moreover, Danielle contends that Chad actually received a copy of the worksheet used prior to the issuance of the decree, and that there are no substantive errors in the calculation itself.

{¶ 24} In *Duke v. Mayberry*, 10th Dist. No. 15AP-160, 2016-Ohio-1031, ¶ 14-16, we noted that although the trial court had failed to include its worksheet in the record, "where the record provides sufficient detail for an appellate court to review a child support award, the failure to incorporate the worksheet into the record does not materially prejudice the appellant" and is not a basis for reversal. That is not the case here, where the trial court

decision refers to and purports to incorporate "the attached child support worksheet" that it then fails to attach. (Findings of Fact at 9.)

**{¶ 25}** At oral argument, Chad's counsel conceded that the court's error in failing to attach a completed worksheet did not affect any of the other issues asserted on appeal, and he does not specifically argue error with the amount of child support awarded by the court. Notwithstanding, we cannot say with confidence from the record before us that there is "sufficient detail" for us to review issues relating to the court's downward deviation. Such evidence may be present in the record somewhere, but the parties have failed to identify where that might be.

**{¶ 26}** And we must observe that the court's failure to include the worksheet has led to a second appeal filed in this court by these parties, in which Chad challenges the trial court's action in filing a worksheet pursuant to Civ.R. 60(A) while this appeal was pending. *See* Docket *Woodford v. Woodford*, 10th Dist. No. 21AP-256, and Appellant's Brief (filed therein on Aug. 16, 2021) at 2. Accordingly, this mistake has led to the unnecessary expenditure of judicial and attorney resources, and we will not compound the problem by engaging a fruitless attempt to determine what calculations the trial court relied upon in awarding child support or suppositions as to whether those calculations were correct or somehow flawed.

**{¶ 27}** Based on the arguments presented by Chad on appeal, we do not believe that the amount of child support is likely to change. But because of the unique posture of this case and the state of the record before us, we are unable to make that determination with certainty, and we therefore conclude that the trial court is in the best position to correct its own error.

**{¶ 28}** For these reasons, on remand the trial court should review the award and deviation, along with the child support worksheet previously relied upon, and determine whether the award comports with the calculations therein; if it does, it should reenter its prior judgment and make the worksheet used part of the record of the case.[2] To this limited extent only, Chad's second assignment of error is sustained.

**{¶ 29}** Having overruled Chad's first, third, and fourth assignments of error, and sustaining his second assignment of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch is reversed and remanded for further proceedings in accordance with the law and consistent with this decision.

*Judgment reversed and*
*remanded with instructions.*

MENTEL and NELSON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Ohio Constitution, Article IV, Section 6(C).

———————————

---

[2] We also observe that our decision here has the likely effect of mooting the appeal presented in *Woodford v. Woodford,* 10th Dist. No. 21AP-256.